# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Black iPhone (solid black case)<br>Item No. I24-24798-001<br>( "Target Device 2" ) | )<br>)<br>) Case No.  **25mj1707**<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the   Southern   District of   California  , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. Sec. 1324, 18 U.S.C. Sec. 371 | Bringing in alens for financial gain and conspiracy |
| 18 U.S.C. Sec. 201 | Receipt of bribes by a public official |

The application is based on these facts:

See attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Aurora Rodriguez*
Applicant's signature

HSI SA Aurora Rodriguez
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by   telephone   *(specify reliable electronic means)*.

Date:   04/10/2025

*David Leshner*
Judge's signature

City and state:  San Diego, California          Hon. David D. Leshner, U.S. Magistrate Judge
Printed name and title

# ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The following property is to be searched:

> Black iPhone (solid black case)
> Item No. I24-24798-001
> (**"Target Device 2"**)

The Target Device is currently in the possession of Homeland Security Investigations, located at 2055 Sanyo Ave suite 120, San Diego, CA, 92154.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of July 24, 2024, up to and including March 24, 2025:

   a.   tending to indicate efforts to facilitate the smuggling of undocumented aliens from Mexico into the United States;

   b.   tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers used to facilitate the smuggling of undocumented aliens from Mexico into the United States;

   c.   tending to identify co-conspirators, criminal associates, or others involved in smuggling of undocumented aliens from Mexico into the United States;

   d.   tending to identify travel to or presence at locations involved in the smuggling of undocumented aliens from Mexico into the United States, such as stash houses, load houses, or delivery points;

   e.   tending to identify the user of, or persons with control over or access to, either of the **Target Devices**; and/or

   f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 18 U.S.C. § 371 and Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Conspiracy to Bring in Aliens for Financial Gain; Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Bringing in Aliens for Financial Gain and Title 18, U.S.C., § 2 – Aiding and Abetting; and Title 18 U.S.C. § 201(b)(2)(C) – Receipt of Bribes by Public Official.

# AFFIDAVIT

I, Special Agent Aurora Rodriguez, being duly sworn, hereby state as follows:

# INTRODUCTION

1. I submit this affidavit in support of applications for warrants to search the following electronic devices:

    Black iPhone (leather case)
    Item No. I24-24798-001
    ("**Target Device 1**")

    Black iPhone (solid black case)
    Item No. I24-24798-001
    ("**Target Device 2**")

as further described in Attachments A-1 and A-2, and to seize evidence of crimes, specifically violations of Title 18 U.S.C. § 371 and Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Conspiracy to Bring in Aliens for Financial Gain; Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Bringing in Aliens for Financial Gain, and Title 18 U.S.C. § 201(b)(2)(C) – Receipt of Bribes by Public Official, as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Farlis ALMONTE ("Defendant"). **Target Device 1** is located at the DHS OIG office at 701 B. St. Suite 560, San Diego, California, 92101, and **Target Device 2** is currently located at the Homeland Security Investigations at 2055 Sanyo Avenue, Suite 120, San Diego, California 92154.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I am a Special Agent with Homeland Security Investigations (HSI) and have been so employed since August of 2021. I am currently assigned to the San Diego Field Office as a Task Force Agent (TFA) with the Department of Homeland Security (DHS) Office of Inspector General (OIG). I am assigned to investigate criminal organizations that are associated to border corruption, including bribery, drug trafficking, and human smuggling. Before my employment as a Special Agent with HSI, I was a Customs and Border Protection Officer (CBPO) for three years.

4. During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California, as well as human smuggling into and through this District. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking and human smuggling investigations, I have knowledge of the operational habits of narcotics traffickers and human smugglers.

5. During my tenure as a CBPO, I was responsible for inspecting travelers and vehicles to ensure compliance with, among other things, customs, immigration, and agricultural laws and regulations, as well as detecting and preventing illegal activities like terrorism, smuggling, human trafficking, drug trafficking, and illegal migration while simultaneously facilitating the flow of legitimate trade and travel. I also participated in the investigation of cases involving the smuggling of aliens from Mexico into the United States.

6. I have participated in investigations involving the use of cellular devices to coordinate and communicate aspects of corrupt activity and sharing sensitive information pertaining to law enforcement. I have experience in interviewing confidential informants, witnesses, targets under investigation, executing arrest/residential warrants, conducting surveillance, and other variety of investigative techniques. I have worked and consulted

with numerous federal agents who have investigated border corruption, narcotics trafficking, and human smuggling throughout the United States.

7. Through the course of my training, experience, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers, in particular those who attempt to smuggle aliens into the United States from Mexico. I am aware that it is a common practice for illicit alien smugglers to work in concert with other individuals and to do so by using cellular telephones. Because they are mobile, the use of cellular telephones permits illicit alien smugglers to easily carry out various tasks related to their smuggling activities, including, for example, remotely monitoring the progress of aliens while in transit, providing instructions to smugglers, warning accomplices about law enforcement activity, discussing with co-conspirators the payments of money in exchange for acts in furtherance of the conspiracy, and communicating with co-conspirators who are transporting aliens and/or proceeds from alien smuggling.

8. Cellular telephones enable such individuals to maintain contact with criminal associates and coordinate with them. As such, those devices can store information about key locations, including the location of stash houses and homes of associates. They also can store, among other things, messages referring to the illicit arrangements and the payment of monies related to those arrangements, the names and contact information of associates, and photographs reflecting human smuggling activity.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations,

I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to facilitate the smuggling of undocumented aliens from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of undocumented aliens from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in smuggling of undocumented aliens from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the smuggling of undocumented aliens from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the **Target Device**(s); and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

10. Beginning in September 2024, OIG identified several reactive alien-smuggling defendants that each asserted that he had been directed to cross through the San Ysidro Port of Entry (POE) through a particular lane during a particular hour-long period. This was because, they stated (or at least alluded to), the group they were working with had a United States Customs and Border Protection Officer (CBPO) working for them.

11. Based on review of those defendants' crossing histories, telephone evidence, and other material, both ALMONTE and Ricardo RODRIGUEZ were identified as the corrupt CBPOs. Subsequent review of other crossing records reflected that both ALMONTE and RODRIGUEZ often admitted into the country several other cars with multiple visible passengers, but they documented that only the driver was in the car.

12. ALMONTE and RODRIGUEZ were charged by Complaint for conspiring to bring in aliens for financial gain, substantive counts for bringing in aliens for financial gain, and receipt of bribes by a public official. *See* 25-MJ-1411. The facts below are described in relation to those charges, followed by a description of the arrest of ALMONTE.

13. Based on the information described in this Affidavit, I request permission to search the **Target Devices** for data beginning on July 24, 2024, one month before an alien-smuggling defendant admittedly smuggled aliens through the San Ysidro Port of Entry (through a lane manned by ALMONTE), up to and including March 24, 2025, the day ALMONTE was arrested.

### *Conspiracy to Bring in Aliens for Financial Gain*

Evidence of ALMONTE and RODRIGUEZ conspiring with others to bring in aliens for financial gain is presented here as a function of three reactive arrests at the POE, including statements by those defendants and phone evidence, as well as other abnormal events at the POE, along with unexplained cash deposits by ALMONTE and RODRIGUEZ into accounts they maintain.

### *Arrest of REACTIVE DEFENDANT #1*

14. At about 2:30 a.m. on September 5, 2024, REACTIVE DEFENDANT #1 drove into the United States through lane 5 at the POE as the sole visible occupant of his white BMW. CBPO Quach was assigned to the lane, and after a cursory inspection, he found two people hiding under a blanket in the rear. The pair were later determined to be aliens without documents allowing them to enter or remain in the United States.

15. In his post-arrest statement, REACTIVE DEFENDANT #1 admitted to the smuggling, adding that a person was to pay him $7,000 for it. That person, REACTIVE

DEFENDANT #1 added, told him to cross through lane 5 between 2:00 a.m. and 3:00 a.m. and that a black male officer, who the group already paid, would be working the lane. But when REACTIVE DEFENDANT #1 approached the lane, an Asian officer was working the lane instead. (ALMONTE appears to be of Dominican descent.)

16.     Evidence recovered from REACTIVE DEFENDANT #1's phone corroborated his statements. In a screenshot of a WhatsApp message thread with what appears to be his smuggling coordinator, the coordinator explained to REACTIVE DEFENDANT #1 that "It's two that are working … with me" and that one was "coming to Tijuana after getting off work" so he could "introduce" REACTIVE DEFENDANT #1 to him. In a separate screenshot of a WhatsApp message thread between a contact saved as "Farli Usa" (ALMONTE's first name is "Farlis") with an unidentified party (believed to his coordinator), "Farli Usa" explained that he "did not get more shifts" but discussed his upcoming shift from 2:00 p.m. to 10:00 p.m., adding that he saw the "driver" who was wearing a hat and driving a white BMW. (During REACTIVE DEFENDANT #1's relevant crossings, he drove his white BMW while wearing a hat.)

17.     REACTIVE DEFENDANT #1 otherwise had three relevant other crossings into the United States: August 17, 2024, through RODRIGUEZ's lane, August 24, 2024, through ALMONTE's lane, and again on August 29, 2024, through RODRIGUEZ's lane. REACTIVE DEFENDANT #1 has identified each of these dates as dates when he was illegally crossing aliens.

18.     About 90 minutes after REACTIVE DEFENDANT #1 was detained on September 5, ALMONTE, working a different primary booth at the POE, queried REACTIVE DEFENDANT #1, his car, and the smuggled persons through a CBP system documenting several pieces of information, including seizure data. Because REACTIVE DEFENDANT #1 was not seeking admission through ALMONTE's lane at the time, ALMONTE appeared to have no legitimate reason to make those queries.

***Arrest of REACTIVE DEFENDANT #2***

19. At about 12:30 p.m. on September 25, 2024, REACTIVE DEFENDANT #2 drove into the United States through lane 17 at the POE with only an adult female passenger visible. But at the primary booth, REACTIVE DEFENDANT #2 provided his ID and only a male's ID on behalf of his passenger. The CBPO noticed this discrepancy and detained them. The adult female then alerted the CBPO to her two kids hidden in the rear of the car. All three were later determined to be aliens without documents allowing them to enter or remain in the United States.

20. Post-arrest, REACTIVE DEFENDANT #2 admitted to the smuggling in exchange for $3,000, adding he was told by his recruiter that the group was working with a CBPO at the POE. Evidence recovered from REACTIVE DEFENDANT #2's phone showed that, approximately 45 minutes before he entered the country, REACTIVE DEFENDANT #2 was directed to enter lane 16 at the POE: The other party told him that "You already know 16" and to "Erase everything."

21. But when REACTIVE DEFENDANT #2 entered the POE, he entered through lane 17. ALMONTE, meanwhile, was manning the primary booth at lane 16 at the time. Two days after REACTIVE DEFENDANT #2 was arrested, ALMONTE queried the same CBP system for both REACTIVE DEFENDANT #2 and the car he was driving, again without any apparent legitimate purpose.

***Arrest of REACTIVE DEFENDANT #3***

22. At about 9:30 p.m. on December 6, 2024, REACTIVE DEFENDANT #3 entered the United States through the POE in a car with four other people. While lined up to enter through lane 16 (ALMONTE was manning that primary booth at the time), a CBPO in pre-primary approached the car and, when presented with IDs for the occupants, noticed that the documents did not appear to have been issued to the passengers. Those four were later determined to be aliens without documents allowing them to enter or remain in the United States, and REACTIVE DEFENDANT #3 was arrested.

23. During his post-arrest statement, REACTIVE DEFENDANT #3 admitted to the smuggling, stating that he was to be paid $1,000 and was told to go through lane 16 that day because the group had a CBPO at the POE working for them. REACTIVE DEFENDANT #3 also admitted to smuggling on behalf of the group earlier, too.

24. Subsequent review of REACTIVE DEFENDANT #3's earlier crossings showed that he often entered the POE through lanes manned by ALMONTE or RODRIGUEZ. In those crossings, despite having at least one other visible occupant in the car, ALMONTE or RODRIGUEZ documented in crossing records that only the driver was present. For example, TECS records show that on October 15, 2024, REACTIVE DEFENDANT #3 entered the POE through lane 15, manned by RODRIGUEZ. A passenger is clearly visible seated next to REACTIVE DEFENDANT #3, but RODRIGUEZ entered only REACTIVE DEFENDANT #3's information into TECS. Similarly on November 12, 2024, REACTIVE DEFENDANT #3 entered the POE through lane 17, again manned by RODRIGUEZ. Several passengers are clearly visible in the car, but RODRIGUEZ again entered only REACTIVE DEFENDANT #3's information into TECS.

25. Then on November 28, 2024, REACTIVE DEFENDANT #3's car was lined up to enter the POE through lane 14. Despite being relatively close to that primary booth, the car then reversed out of that lane, forcing two other cars to reverse out of the way, before maneuvering to line up for lane 15, manned by RODRIGUEZ.

26. Again, several people (at least three) can be seen in the car along with REACTIVE DEFENDANT #3 when he entered the country. But RODRIGUEZ entered only REACTIVE DEFENDANT #3's information into TECS. REACTIVE DEFENDANT #3 has admitted that he was smuggling aliens on that date.

***ALMONTE Allows Entry of Car with TECS Alert Without Sending to Secondary***

27. On December 6, 2024, a white Honda sedan with an active TECS alert on its license plate entered the POE through lane 16, manned by ALMONTE. The TECS alert generated a mandatory referral to secondary inspection of the car. But ALMONTE instead allowed the car to enter the United States without going to secondary inspection.

28. Shortly thereafter, ALMONTE contacted the vehicle secondary lot supervisor and asserted that he (ALMONTE) had received a "system error" on his primary terminal regarding the license plate of a white car. ALMONTE added that there was not a white car at his booth when the alert populated, asserting instead that there was only a blue car present and that it was not the same car that generated the TECS alert.

29. But TECS records show otherwise. The white sedan with the license plate tied to the TECS alert can be seen in photographs as it approached ALMONTE's booth at the time. ALMONTE otherwise inputted only an "unknown" number of passengers in the car for the vehicle encounter.

30. Review of records show that this car had five prior crossings into the United States between late October 2024 and early December. Each prior crossing was processed either by ALMONTE or RODRIGUEZ, and each was suspicious: Photographs show that the driver, who appeared to be young, presented an ID for a 62-year-old man as his own, and that multiple occupants were visible in the car but only the driver was inputted into TECS.

**Cash Deposit Activity**

31. Both ALMONTE and RODRIGUEZ, in bank accounts they maintain, deposited abnormal amounts of cash in the latter half of 2024.

32. In the year-and-a-half period before mid-August 2024, ALMONTE appeared to deposit only about $1,600 in cash into his account through about five transactions. No deposit exceeded $700. But beginning in late August 2024 and through late November 2024 (a three-month period), he appeared to deposit almost $22,000 in cash into his account broken out into small deposits. And some of those deposits—like on September 26 and November 17—were made on the same day.

33. Similarly, while RODRIGUEZ had no cash deposits to his account between January 2023 and early May 2024, beginning on May 11, 2024, and through late November (a six-month period), he appeared to deposit almost $24,000 into his account, also broken out into small deposits.

34. In my training and experience and conversations with other officers, I am aware that corrupt officers often get paid in cash and then deposit the criminal proceeds in smaller amounts and sometimes across several bank accounts.

**Bringing in Aliens for Financial Gain – September 25, 2024**

35. As described above, on September 25, 2024, REACTIVE DEFENDANT #2 drove into the United States through the wrong lane – lane 17 – at the San Ysidro POE with an adult female passenger, later determined to be Diana JUAREZ-Sanchez, visible. At the primary booth, he presented to the CBPO only a male's ID on behalf of JUAREZ, and so both were quickly detained. JUAREZ then alerted to the CBPO to her two kids, M.L.S.J. and M.B.S.J., that were hidden in the rear of the car. Subsequent review of records determined that JUAREZ, M.L.S.J., and M.B.S.J. were aliens with no legal right to enter or remain in the United States.

36. REACTIVE DEFENDANT #2 later admitted to the smuggling, adding that he was told by someone he was working with to enter lane 16 instead, which CBP records reflect was manned by ALMONTE. Evidence from REACTIVE DEFENDANT #2's telephone supported his claim. Also, two days after REACTIVE DEFENDANT #2 was arrested, ALMONTE queried, without any apparent legitimate reason, a CBPO system for both REACTIVE DEFENDANT #2 and the car he was driving.

**Bringing in Aliens for Financial Gain – November 28, 2024**

37. As described above, on November 28, 2024, REACTIVE DEFENDANT #3 entered the San Ysidro POE and was lined up to approach the primary booth at lane 14. But, as shown by video of the pre-primary area, REACTIVE DEFENDANT #3 appeared to reverse from that line, forcing two other cars behind him to similarly reverse, so that he could maneuver his car to enter through lane 15, instead.

38. RODRIGUEZ was manning the primary booth at lane 15 at the time. Photographs of the car REACTIVE DEFENDANT #3 was driving that day show at least three passengers—FNU LNU, FNU LNU, and FNU LNU—visible in the car. But RODRIGUEZ documented in

crossing records that only REACTIVE DEFENDANT #3 was in the car. REACTIVE DEFENDANT #3 has admitted that those individuals were aliens.

***Receipt of Bribes by a Public Official***

39. As described above, during the relevant period, up to and including January 20, 2025, both ALMONTE and RODRIGUEZ were United States Customs and Border Protection Officers. And as CBPOs in the primary booths at the San Ysidro POE, they were tasked with, among other things, ensuring that only those persons with the legal right to enter the country do so.

40. But, as shown above, both ALMONTE and RODRIGUEZ failed to perform their official duties, often admitting without any meaningful inspection cars with multiple passengers, while documenting that only the drivers were present. And during that period, bank accounts controlled by ALMONTE and RODRIGUEZ reflected abnormal cash deposit activity. Consistent with my training and experience and discussions with others in law enforcement, corrupt officers often agree to forego to perform their official duties in exchange for cash payments.

**Arrest of ALMONTE**

41. On March 24, 2025, at about 2:15 p.m., Special Agents arrested FARLIS ALMONTE at the Otay Mesa Port of Entry Cargo Export. ALMONTE was charged with violating Title 18 U.S.C. § 371 and Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Conspiracy to Bring in Aliens for Financial Gain; Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Bringing in Aliens for Financial Gain and Title 18, U.S.C., § 2 – Aiding and Abetting; and Title 18 U.S.C. § 201(b)(2)(C) – Receipt of Bribes by Public Official.

42. When he was arrested, agents found **Target Device 1** in ALMONTE's hand and seized it. And after ALMONTE was transported to an HSI office for an interview, agents found **Target Device 2** in ALMONTE's lunchbox. ALMONTE was later shown the **Target Devices** and confirmed that both belong to him.

43. Based upon my training and experience, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and

opinions set forth in this Affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that ALMONTE was using the **Target Devices** to communicate with others to further the smuggling of undocumented aliens into the United States.  Further, in my training and experience, alien smugglers may be involved in the planning and coordination of an alien smuggling event in the days and weeks prior to an event.

44.     Based upon my training and experience, it is also not unusual for individuals, like ALMONTE, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim.

45.     Accordingly, I request permission to search the **Target Devices** for data beginning on July 24, 2024, one month before REACTIVE DEFENDANT #1 went through ALMONTE's lane at the POE with aliens concealed in his car, up to and including March 24, 2025, the day ALMONTE was arrested.

## METHODOLOGY

46.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive

equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

47. Following the issuance of this warrant, I will collect the **Target Devices** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

48. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

49. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

50. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Devices** will yield evidence of ALMONTE's violations of Title 18 U.S.C. § 371 and Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Conspiracy to Bring in Aliens for Financial Gain; Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Bringing in Aliens for Financial Gain and Title 18, U.S.C., § 2 – Aiding and Abetting; Title 18 U.S.C. § 201(b)(2)(C) – Receipt of Bribes by Public Official.

51. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A-1 and A-2 and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Aurora Rodriguez*
Special Agent Aurora Rodriguez
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 10th day of April 2025.

*David Leshner*
_____
HONORABLE DAVID D. LESHNER
UNITED STATES MAGISTRATE JUDGE

which are evidence of violations of Title 18 U.S.C. § 371 and Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Conspiracy to Bring in Aliens for Financial Gain; Title 8 U.S.C. § 1324(a)(2)(B)(ii) – Bringing in Aliens for Financial Gain and Title 18, U.S.C., § 2 – Aiding and Abetting; and Title 18 U.S.C. § 201(b)(2)(C) – Receipt of Bribes by Public Official.